<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| L.E.A.D., INC., t/a LAW ENFORCEMENT AGAINST DRUGS AND VIOLENCE,<br><br>Plaintiff,<br><br>v.<br><br>C.E. MENDEZ FOUNDATION, INC.,<br><br>Defendant. | Civil Action No. 25-14237 (GC) (RLS)<br><br><u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon Defendant C.E. Mendez Foundation, Inc.'s Motion to Dismiss Plaintiff L.E.A.D., Inc., t/a Law Enforcement Against Drugs and Violence (LEAD)'s First Amended Complaint (FAC) (ECF No. 16) under Federal Rule of Civil Procedure (Rule) 12(b)(6).  (ECF No. 18.)  Plaintiff opposed, and Defendant replied.  (ECF Nos. 19, 20.)  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

### A.      Factual Background[1]

#### 1.      The Parties

Plaintiff LEAD is a not-for-profit corporation with its principal place of business in Allentown, New Jersey. (ECF No. 16 ¶ 1.) It offers trainings to primarily law enforcement officers on how to instruct children in school and after-school programs about the dangers of drugs and violence. (*Id.*)[2] LEAD operates in all 50 states. (*Id.*) In providing these trainings, LEAD uses Defendant C.E. Mendez Foundation's curricula. (*Id.*) Defendant is a Florida not-for-profit corporation with its principal place of business in Atlanta, Georgia. (*Id.* ¶ 2.) It develops curricula related to substance abuse and violence prevention for students, teachers, other educational staff, and parents. (*Id.*)

#### 2.      The Preferred Seller Agreement

On or about December 1, 2015, the parties entered into a Preferred Seller Agreement (PSA). (*Id.* ¶ 8; *see also* ECF No. 16-1.)[3] At the time the parties signed the PSA, Plaintiff was a start-up company operating from one location in New Jersey, while Defendant was a well-established company that had been in business for decades. (ECF No. 16 ¶¶ 9, 81.) And Plaintiff's customers consisted of New Jersey police departments. (*Id.* ¶ 81.)

---

[1]      On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted).

[2]      LEAD also provides trainings to educators and prevention specialists, but its primary business is offering trainings and selling curricula materials to law enforcement. (ECF No. 16 ¶¶ 1, 16.)

[3]      The PSA is integral to, explicitly relied on, and attached to the FAC, so the Court may consider it. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Under the PSA, Plaintiff was required to purchase Defendant's curricula materials and resell those materials at a price and amount specified in the agreement. (*Id.* ¶ 13.) In particular, Plaintiff would sell those materials to law enforcement agencies, who in turn would distribute the materials to targets of the training such as school children. (*Id.* ¶ 82.)

The PSA outlines that Defendant "hereby authorizes [Plaintiff], as an independent contractor, to market and sell the [curricula materials] and trainings to . . . law enforcement agencies providing prevention education programs in approved areas within the United States[.]" (ECF No. 16-1 at 2.)[4]  It further outlines that if Plaintiff does not use "any other competing educational programs," apart from Defendant's, then Defendant, "during the term of this agreement[,] will not authorize any other reseller to sell or distribute the [curricula materials] to Law Enforcement agencies anywhere within the United States." (*Id.* at 3 (internal quotation marks omitted).) And it states that confidential information disclosed from one party to another as a result of the PSA "shall be used solely for the purposes of [the PSA] and neither party shall in any way reveal, disclose or use [c]onfidential [i]nformation of the other party than with respect to its performance under [the PSA]." (*Id.* at 7.)  The PSA automatically renews every two years unless terminated by either party 90 days prior to renewal. (ECF No. 16 ¶ 12.)

In the years following the execution of the PSA, the parties' relationship was mostly harmonious.  Defendant trained approximately 50 of Plaintiff's instructors and certified them as "Leaders." (*Id.* ¶ 18.)  Of those Leaders, Plaintiff selected approximately 15 to be certified by Defendant as "Master Trainers." (*Id.* ¶ 19.)  "Master Trainers" are responsible for training new LEAD instructors to teach Defendant's curricula. (*Id.*)  Plaintiff grew into one of the largest

---

[4]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

3

organizations of its kind in the United States. (*Id.* ¶ 22.) And, in turn, Plaintiff became Defendant's largest revenue source, generating approximately 30% of Defendant's sales to law enforcement agencies throughout the United States. (*Id.* ¶ 23.) Plaintiff also promoted Defendant's curricula at training sessions, on Plaintiff's website, at conferences and tradeshows, and in various other promotional materials. (*Id.* ¶ 24.) Given this symbiotic relationship, the parties allowed the PSA to renew "repeatedly over the years." (*Id.* ¶ 27.)

### 3. The Logistics Agreement

Within the past several years, following Defendant's suggestion, the parties orally agreed to a "Logistics Agreement," under which Defendant would ship the curricula materials directly to Plaintiff's customers, including police departments and other law enforcement agencies, as a cost-saving measure to Plaintiff. (*Id.* ¶ 28.)[5] In other words, while customers would still be purchasing the materials from Plaintiff, the Logistics Agreement removed Plaintiff as the middleman for shipping purposes. According to Plaintiff, "the parties agreed that [Defendant] would function as a shipper/logistics company for [Plaintiff], with the understanding and expectation by [Plaintiff] that the information it provided to [Defendant] was confidential and proprietary as to [Plaintiff] . . . and would only be used to ship the materials to [Plaintiff's] customers." (*Id.* ¶ 29.) In return, Plaintiff alleges Defendant received "direct access to and a means to communicate directly with [Plaintiff's] customers," and "prompt shipments of its [curricula] materials directly to law enforcement agencies." (*Id.* ¶¶ 31, 117.) The Logistics Agreement was not set to last for a specific period of time, and it did not prohibit Plaintiff from shipping the materials itself nor did it prohibit Defendant from declining to ship any particular order. (*Id.* ¶ 30.)

---

[5]     Plaintiff does not allege when the Logistics Agreement took effect. (*See* ECF No. 16 ¶¶ 28-37.)

#### 4.    *Defendant's Usurpation of Plaintiff's Business*

Plaintiff alleges that, sometime in 2024 or 2025, Defendant orchestrated a scheme to usurp Plaintiff's operations and customers. (*Id.* ¶ 38.) In December 2024, Defendant hired Julie Yocca, an executive who recently resigned from her job with Plaintiff. (*Id.* ¶ 39.) Yocca was intimately familiar with Plaintiff's internal workings, and at the time of her resignation she was in the process of developing a national after-school initiative. (*Id.*) Plaintiff alleges Defendant exploited Yocca's knowledge of Plaintiff's confidential and proprietary information to further its plan to take over Plaintiff's business. (*Id.* ¶ 40.) In particular, Defendant leveraged Yocca's knowledge—despite non-compete and confidentiality provisions in her employment agreement with Plaintiff that Defendant was aware of—to issue updated after-school curricula, but Defendant refused to sell these updated materials to Plaintiff because it intended to take Plaintiff's business. (*Id.* ¶¶ 55-56, 138-139.)

Defendant's alleged scheme went beyond its partnership with Yocca. Unbeknownst to Plaintiff, Defendant used the contact information it received through the PSA and Logistics Agreement to send direct solicitations to Plaintiff's customers with the intention of selling curricula materials to those customers. (*Id.* ¶ 41-42.) Under the PSA, Defendant was required to sell materials to Plaintiff at a discounted rate, so Defendant could make higher profits by selling to Plaintiff's customers at a non-discounted rate. And this non-discounted rate was still perceived as a bargain for the customers because it was 10% lower than the rate at which Plaintiff sold the products—a rate locked in by the PSA. (*Id.* ¶ 46.) In other words, Plaintiff alleges Defendant leveraged the requirements of the PSA to steal Plaintiff's customers. Further, without Plaintiff's knowledge or consent, Defendant sent some of the solicitations to Plaintiff's customers inside the very same packages by which Defendant shipped curricula materials to these customers pursuant to the Logistics Agreement with Plaintiff. (*Id.* ¶ 41.) Thus, beyond just shipping the products to

Plaintiff's customers, Defendant leveraged the Logistics Agreement to entice those customers to purchase directly from Defendant.  As a result, Plaintiff alleges that its customers are filling repurchase orders through Defendant instead of through Plaintiff.  (*Id.* ¶ 43.)

Plaintiff alleges that in the spring of 2025, Defendant instituted further measures to usurp Plaintiff's business operations.  (*Id.* ¶ 48.)  For example, Plaintiff depended on its Master Trainers to teach new instructors, which in turn would help Plaintiff's business grow, but Defendant considerably limited the Master Trainers' abilities to facilitate that growth.  First, Defendant demanded that the Master Trainers be recertified in order to teach new instructors, but Defendant refused to certify those trainers.  (*Id.* ¶¶ 50-51.)  Second, Defendant reduced the maximum number of Master Trainers from approximately fifteen to five.  (*Id.* ¶ 50.)  Third, and in concert with Defendant's efforts to minimize the role of Master Trainers, Defendant declared it would "take over Plaintiff's training of its instructors[.]"  (*Id.* ¶¶ 52.)  Defendant demanded that Plaintiff pay Defendant to take over Plaintiff's training, including paying travel costs for Defendant's trainers.  (*Id.* ¶ 54.)  Plaintiff alleges that this demand was approximately twice as much as Plaintiff was incurring to conduct its own trainings using its own Master Trainers.  (*Id.*)  Plaintiff protested the changes to the training structure and refused Defendant's demands to pay.  (*Id.* ¶ 60.)

In response, on July 10, 2025, Defendant issued a written default notice.  (*Id.* ¶ 62.)  According to the notice, Defendant stated that Plaintiff breached the PSA.  (*Id.* ¶¶ 63-65.)  While the notice does not specify what provision was breached, it stated that Plaintiff's trainers were improperly certified, but it did not specify which trainers—Master or otherwise—were non-compliant.  (*Id.* ¶ 65.)  To cure these deficiencies, Defendant demanded that Plaintiff's trainers meet Defendant's trainer requirements, but Defendant did not define or send Plaintiff a list of those

requirements, and the PSA similarly does not define them. (*Id.* ¶¶ 68-69.) Pursuant to the PSA, Defendant gave Plaintiff thirty days to cure these apparent deficiencies. (*Id.* ¶¶ 72-73.)

### B.      Procedural Background

Plaintiff filed its initial Complaint on August 7, 2025—before the 30-day notice period elapsed—challenging the termination notice. (ECF No. 1.) One day later, Defendant filed a lawsuit against Plaintiff in Florida state court, and Plaintiff removed that suit to the Middle District of Florida. *See C.E. Mendez Found., Inc. v. L.E.A.D., Inc.*, Civ. No. 25-02296, Dkt. 1-1 (M.D. Fla. Aug. 27, 2025). In that lawsuit, Defendant sought, *inter alia*, a declaration that the PSA was ripe for termination because of Plaintiff's alleged breach; damages; and specific performance. *See id.* Sometime between thirty and sixty days after notifying Plaintiff of the apparent deficiencies, Defendant claimed the PSA was terminated, despite the New Jersey Franchise Practices Act (NJFPA) requiring sixty days and good cause to terminate. (*Id.* ¶¶ 75, 92.)

On October 2, 2025, the Middle District of Florida dismissed Defendant's suit under the first-to-file rule given that the instant matter in the District of New Jersey "involve[s] overlapping issues and parties." *C.E. Mendez Found., Inc. v. L.E.A.D., Inc.,* Civ. No. 25-02296, Dkt. 14 (M.D. Fla. Oct. 2, 2025) (quoting *Manuel v. Conergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005)). On October 15, 2025, Plaintiff filed the operative seven-Count FAC in this case, which incorporated the development that Defendant acted on its termination notice. (ECF No. 16.) Plaintiff asserts claims under the NJFPA (Count I), (*id.* ¶¶ 77-99), and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* (Count II), (*id.* ¶¶ 100-104). Plaintiff also brings claims for breach of the PSA (Count III), (*id.* ¶¶ 105-112); breach of the Logistics Agreement (Count IV), (*id.* ¶¶ 113-120); breach of the covenant of good faith and fair dealing (Count V), (*id.* ¶¶ 121-128); tortious interference with contractual relations (Count VI), (*id.* ¶¶ 129-142); and promissory estoppel (Count VII), (*id.*

¶¶ 143-149).[6]  Plaintiff seeks damages and attorney's fees.  (*See, e.g.*, *id.* at 19.)  It also seeks injunctive relief enjoining Defendant from terminating the PSA, prohibiting Defendant from soliciting or selling to Plaintiff's customers, and compelling Defendant to destroy confidential information it obtained from Plaintiff.  (*Id.*)  On November 5, 2025, Defendant filed a Motion to Dismiss the FAC in its entirety.  (ECF No. 18.)  That Motion is fully briefed and pending before the Court.

## II.     <u>**LEGAL STANDARD**</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'"  *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim."  *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

---

[6]      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

### III.   DISCUSSION

#### A.   NJFPA[7]

The NJFPA "was enacted 'to protect franchisees from unreasonable termination by franchisors that may result from a disparity of bargaining power[.]'" *Golden Fortune Import & Export Corp. v Mei-Xin Ltd.*, Civ. No. 22-1710, 2022 WL 3536494, at \*2 (3d Cir. Aug. 5, 2022) (quoting N.J. Stat. Ann. § 56:10-2). "Consistent with its protective purpose, it prohibits franchisors from terminating a franchise 'without good cause.'" *Id.* (quoting N.J. Stat. Ann. § 56:10-5). It defines a franchise as "a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." N.J. Stat. Ann. § 56:10-3(a).

Defendant does not challenge whether Plaintiff has plausibly alleged a violation of the statute but rather asserts that the NJFPA does not apply to the relationship between the parties. "A franchise exists under the NJFPA if: (1) there is a 'community of interest' between the franchisor and the franchisee; (2) the franchisor granted a 'license' to the franchisee; and (3) the parties contemplated that the franchisee would maintain a 'place of business' in New Jersey." *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 268-69 (3d Cir. 1995) (citing N.J. Stat Ann. §§ 56:10-3(a), 56:10-4). Defendant contends Plaintiff has not alleged any of these three requirements. (*See* ECF No. 18-1 at 15-23.) The Court addresses these requirements in reverse order.[8]

---

[7]    The Court applies New Jersey law to analyze the NJFPA claim. *See supra* Section III.C.2.

[8]    In the context of summary judgment, the Supreme Court of New Jersey held that when "the existence of the franchise is so closely related to the dispositive factual findings of 'place of business,' 'license,' and 'community of interest' . . . the appropriate standard is whether the evidence presented was sufficient to permit a factfinder to determine that the statutory

### 1.    *Place of Business*

The NJFPA applies "to a franchise . . . the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey."  N.J. Stat. Ann. § 56:10-4(a)(1).  "Thus, the statutory terms permit a franchisee to receive the Act's protection if performance of the franchisee's activities *either* contemplates *or* requires a New Jersey place of business."  *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 136 (N.J. 1992).  "Hence, a franchise would be governed by the Act . . . [if] the parties reasonably anticipated that the franchisee would establish a New Jersey place of business."  *Id.*; *see also Ocean City Express v. Atlas Van Lines, Inc.*, 46 F. Supp. 3d 503, 508-09 (D.N.J. 2014) ("[I]n order to satisfy the 'place of business' requirement under the NJFPA, the contractual agreement must 'contemplate or require' the franchisee to establish or maintain a place of business within the state of New Jersey.").

In most scenarios under the NJFPA, a "place of business" means "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services.  Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle[.]"  N.J. Stat. Ann. § 56:10-3(f).  But "with respect to persons who do not make a majority of their sales directly to consumers," a "place of business" can also be "an office or a warehouse from which franchisee personnel visit or call upon customers or from

---

requirements for the existence of a franchise were met."  *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 136 (N.J. 1992).  In other words, the existence of a franchise under the NJFPA is a question of fact, not a question of law, if "the entire relationship between the parties may [not] be deduced from their written arrangements."  *Id.*  The Court therefore takes due note of the fact-intensive inquiry that may be needed to analyze these claims and decides this Motion to Dismiss accordingly.  *See Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 768 n.5 (3d Cir. 2013) (noting that "fact[-]intensive" tests "may generally require resolution at the summary judgment stage, rather than at the motion to dismiss stage").

which the franchisor's goods are delivered to customers." *Id.*; *see also Ocean City Express v. Atlas Van Lines, Inc.,* Civ. No. 13-1467, 2014 WL 654589, at \*6 n.3 (D.N.J. Feb. 19, 2014) (noting the exception).

In its briefing, Plaintiff argues this exception applies but fails to cite any caselaw on a court's interpretation or application of the exception. (*See* ECF No. 19 at 18.)  Defendant, for its part, ignores the exception altogether. (*See* ECF No. 18-1 at 15-18; ECF No. 20 at 8-10.)  While decided in the context of summary judgment, the Court finds instructive the Northern District of California's interpretation of the NJFPA exception in *Oracle America, Inc. v. Innovative Technology Distributors, LLC*, Civ. No. 11-01043, 2012 WL 4122813 (N.D. Cal. Sept. 18, 2012). There, Innovative Technology Distributors, LLC (ITD) was a reseller of technology products to Alcatel-Lucent, which was a "prominent . . . equipment provider." *Id.* at \*1.  The court found the exception applied.  It first analyzed whether the majority of ITD's sales were made directly to consumers.  *Id.* at \*16.  If they were, then the exception would not apply.[9]  *See* N.J. Stat. Ann. § 56:10-3(f).  Because the statute did not define the term "consumer," and there was no caselaw construing the term in the context of the statute, the court relied on Black's Law Dictionary, which defined consumer as "[a] person who buys goods or services for personal, family or household use, with no intention for resale."  *Oracle*, 2012 WL 4122813, at \*16 (quoting Black's Law

---

[9]    If the exception did not apply, the franchise must have required or contemplated that ITD maintain a "place of business" in New Jersey under the standard "place of business" definition. *See* N.J. Stat. Ann. § 56:10-3(f) (defining "place of business" as "a fixed geographical location at which the franchisee displays for sale and sells the franchisor's goods or offers for sale and sells the franchisor's services.  Place of business shall not mean an office, a warehouse, a place of storage, a residence or a vehicle.").  While the court found the exception did apply, it also analyzed the standard "place of business" definition and found that, in any event, it was also satisfied because "ITD has adduced evidence that its Edison[, New Jersey] office was the hub for substantive sales and marketing activity including numerous customer demonstrations and meetings."    *Oracle Am., Inc. v. Innovative Tech. Distribs., LLC,* Civ. No. 11-01043, 2012 WL 4122813, at \*16 (N.D. Cal. Sept. 18, 2012).

11

Dictionary (9th ed. 2009)).[10]  The Court reasoned that because the equipment providers to whom ITD sold its products "are not purchasing [the] product[s] primarily for their personal use, they are not consumers." *Id.*  Rather, the products were being purchased with the intention for resale.  *Id.*

Next, the court analyzed whether ITD's "location is the place where the franchisee's employees call upon customers or goods are delivered from the location." *Id.*  And it found in the affirmative based on a declaration that ITD's Edison, New Jersey office was the place where "its sales people 'call[ ] upon customers,' and this office [was] the location 'where Sun/Oracle goods were stored and delivered to customers.'" *Id.*

Here, Plaintiff plausibly alleges the performance of the PSA "contemplates . . . [Plaintiff] to establish or maintain a place of business within the State of New Jersey."  N.J. Stat. Ann. § 56:10-4(a)(1).  This is because (1) Plaintiff alleges it maintains a place of business within the meaning of the exception listed in § 56:10-3(f), and (2) it is plausible that the parties reasonably anticipated the maintenance of such a place of business when they executed the PSA.

As for the place of business, Plaintiff alleges that when the parties signed the PSA, the sales were not intended to be made directly to consumers.  (*Id.* ¶ 82.)  Indeed, Plaintiff alleges the sales were instead intended to be made to law enforcement agencies who in turn distributed the materials to consumers—"namely school children throughout the United States." (*Id.*)  The Court agrees that Plaintiff's law enforcement *customers* do not constitute *consumers* because they "are not purchasing [the] product[s] primarily for their personal use," *Oracle*, 2012 WL 4122813, at *16, but rather for professional reasons, *see Consumer*, Black Law's Dictionary (12th ed. 2024).  Thus,

---

[10]    The most recent definition of "consumer" in Black Law's Dictionary is similar.  *See Consumer*, Black Law's Dictionary (12th ed. 2024) (defining "consumer" as "[s]omeone who buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes").

Plaintiff has alleged that it is an entity that does "not make a majority of their sales directly to consumers," and has "an office or a warehouse from which franchisee personnel visit . . . customers" within the State.   N.J. Stat. Ann. § 56:10-3(f).   Plaintiff satisfies this second requirement by alleging that it trains law enforcement customers at its Allentown, New Jersey headquarters.  (*Id.* ¶ 83.)

As for "contemplation" of such a business, N.J. Stat. Ann. § 56:10-4(a)(1), the PSA "grants to [Plaintiff] a non-exclusive limited Reseller License to market and sell the [curricula materials] to law enforcement agencies . . . to use within the State of New Jersey and certain other approved geographical areas within the United States," (ECF No. 16-1 at 8).  This provision, coupled with the allegations that (1) the parties were aware, at the time of signing, that Plaintiff's sole location was in New Jersey, and its existing customers were New Jersey police departments, (ECF No. 16 ¶¶ 79, 81), and (2) Plaintiff did maintain such a "place of business" in New Jersey after execution of the contract, (*id.* ¶ 83), is enough for Plaintiff to have sufficiently alleged that "the parties reasonably anticipated that the franchisee would establish," such place of business in New Jersey within the meaning of the NJFPA, *Instructional Sys.*, 614 A.2d at 136.

### 2.    *License*

"Before a party may be deemed a franchisee subject to the [NJFPA's] protections, it must show that it had been granted 'a license to use a trade name, trade mark, service mark, or related characteristic[ ].'"  *Id.* at 138 (quoting N.J.S.A. § 56:10-3(a)).  However, "not every grant of permission to use a trademark in the sale of goods or services is a 'license' within the meaning of the [NJFPA]."  *Id.*  If it were the case that every "limited agreement constitutes a license to use a trademark, then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." *Colt Indus., Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 120 (3d Cir. 1988).  "At a minimum, the term 'license' [under the NJFPA]

means that the alleged franchisee must use the name of the franchisor in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the . . . licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee." *Instructional Sys.*, 614 A.2d at 139 (internal quotation marks omitted). "When interpreting the NJFPA, a court must . . . consider not only the parties' written agreement, but also their relationship, in order to determine whether a license exists." *McPeak v. S-L Distrib. Co.*, Civ. No. 12-348, 2014 WL 320074, at \*5 (D.N.J. Jan. 29, 2014) (citations omitted).

The Supreme Court of New Jersey upheld the finding of such a license in the summary judgment context in *Instructional Systems*. There, the licensor was Computer Curriculum Corporation (CCC), a producer and marketer of an "integrated learning system that uses computer technology to teach and monitor a student's progress in" various school subjects. *Instructional Sys.*, 614 A.2d at 126. Instructional Systems, Inc. (ISI), the exclusive distributor of CCC's products in the Northeast, was the licensee. *Id.* The Court acknowledged that ISI "operated under its own trade name, and [did not] use CCC's name on its stationery, business cards, or on any business signs." *Id.* at 139. At the same time, the Court reasoned that ISI's "relationship with CCC [was] quite different from that of a department store that sells Apple or IBM computers." *Id.* Namely, their 1984 Reseller Agreement required ISI to "*use its best efforts* to maintain and *promote* CCC's name, trademark and logo on the Products." *Id.* (quoting Reseller Agreement) (emphasis added by Supreme Court of New Jersey). And, as the Court explained:

> The CCC computerized-educational-learning system is not an "off-the-shelf" product that can be purchased at the neighborhood-appliance store. Rather, it is a unique combination of hardware and software whose identity is integrally related with that of ISI. Significantly, the 1984 Reseller Agreement prohibited ISI from selling any products competitive with CCC products. Moreover, CCC prohibited ISI from developing or designing any products that might compete with CCC's products. Furthermore, CCC obligated

14

> ISI to educate and train users of CCC products on a continuing basis. Surely, a factfinder could find the presence of the [license] criteria here.

*Id.*

Similarly, but in the motion to dismiss context, the District of New Jersey found a plaintiff alleged the existence of a license in *Lawmen Supply Company of New Jersey, Inc. v. Glock, Inc.*, 330 F. Supp. 3d 1020 (D.N.J. 2018). There, the licensor was a pistols manufacturer. *Id.* at 1027. The manufacturer entered into a Distribution Agreement under which the alleged licensee would distribute the pistols to the law enforcement market. *Id.* The court reasoned that the plaintiff "made a sufficient allegation of a license" given that:

> The Distribution Agreement clearly "grant[s] [plaintiff] a license to market, promote, demonstrate, and sell [defendant's] products." Plaintiff's status as a "[Defendant] Only" distributor further shows a connection to the public between Plaintiff and Defendant, as does the longstanding relationship between the parties.

*Id.* (first alteration in original).

Here, the Court similarly finds Plaintiff has made a sufficient allegation of a license. As in *Instructional Systems* and *Lawmen*, the PSA requires Plaintiff to market Defendant's products. *See* ECF No. 16-1 at 5 ("[Plaintiff] shall use its best efforts to market and sell the [Defendant's curricula materials.]"); *id.* at 2 ("[Defendant] . . . authorizes [Plaintiff] . . . to market and sell [Defendant's curricula] and trainings[.]"); *id.* at 6 (authorizing Plaintiff to "enter into an agreement with approved vendors to create, produce and manufacture appropriate 'merchandise' . . . to be sold or utilized . . . which depict the proprietary names, marks, logos" of Defendant).) And over the past ten years, Plaintiff promoted those products at all its training sessions, on its website, and at conferences and tradeshows. (ECF No. 16 ¶ 25.)

Also like in *Instructional Systems*, Defendant's curriculum "is not an 'off-the-shelf' product that can be purchased at the neighborhood-appliance store." 614 A.2d at 139. Rather, "it

15

is a unique combination" of materials that enmesh the identities of the parties. *See id.* Indeed, under the PSA, Plaintiff's instructors not only "educate and train users of [Defendant's] products" like in *Instructional Systems*, *id.*, but must also ensure that Plaintiff's law enforcement customers teach students "in strict accordance with [Defendant curricula's] design and format," (ECF No. 16-1 at 3).

Finally, in *Lawmen*, the Court found it relevant that the plaintiff distributed only the defendant's products and no products of other entities. 330 F. Supp. 3d at 1027. Here, Plaintiff alleges that Defendant "was and is [Plaintiff's] supplier of [curricula] materials." (ECF No. 16 ¶ 14.) The Court finds that at this stage, Plaintiff has made a sufficient allegation of a license. Plaintiff alleges facts that could plausibly "create a reasonable belief on the part of the consuming public that there is a connection between the . . . [Defendant] and [Plaintiff] by which [Defendant] vouches . . . for the activity of [Plaintiff]." *Instructional Sys.,* 614 A.2d at 139.

### 3.    *Community of Interest*

The NJFPA defines a franchise as "a written arrangement . . . in which there is *a community of interest* in the marketing of goods or services . . . ." N.J. Stat. Ann. § 56:10-3 (emphasis added). "The community-of-interest requirement addresses the inequality of bargaining power between the parties and is critical in distinguishing franchises from other types of business relationships." *Instructional Sys.*, 614 A.2d at 140; *see also Golden Fortune*, 2022 WL 3536494, at *3 ("The lynchpin of the community of interest element . . . is the vulnerability of the purported franchisee.") "The [NJFPA's] concern is that once a business has made substantial franchise-specific investments it loses all or virtually all of its original bargaining power regarding the continuation of the franchise." *Instructional Sys.*, 614 A.2d at 141. "Specifically, the franchisee cannot do anything that risks termination, because that would result in a loss of much or all of the value of

16

its franchise-specific investments." *Id.* "Thus, the franchisee has no choice but to accede to the demands of the franchisor, no matter how unreasonable those demands may be." *Id.*

Guided by these principles, courts have articulated various factors to consider when evaluating the existence of a community of interest. The Third Circuit has summarized these factors as: "(1) [the] licensor's control over the licensee, (2) the licensee's economic dependence on the licensor; (3) disparity in bargaining power, and (4) the presence of a franchise-specific investment by the licensee." *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131, 1143 (3d Cir. 1991).

Applying these four factors, the Court finds that Plaintiff has plausibly alleged that the parties shared a community of interest. First, Plaintiff has alleged that, through the PSA, Defendant exerts considerable control over it. "Indicators of control include sales quotas and whether advertising and promotional materials provided to the purported franchisee are merely suggested as opposed to required." *Golden Fortune*, 2022 WL 3536494, at *4 (citing *Colt Indus. Inc.*, 844 F.2d at 120–21). Here, the PSA imposed marketing and promotional requirements on Plaintiff. (*See* ECF No. 16-1 at 5 ("[Plaintiff] shall use its best efforts to market and sell the [Defendant's curricula materials.]").) *See also Lawmen*, 330 F. Supp. 3d at 1034 (citing requirement for plaintiff "to use best sales efforts to market [d]efendant's products" in support of finding plaintiff plausibly alleged community of interest). And the PSA included other provisions that exerted control over Plaintiff. For example, Plaintiff is required to sell the curricula materials to its own customers at a price provided in the PSA, (ECF No. 16 ¶ 13), and Plaintiff's trainers are required to be certified by Defendant in advance of their trainings, (*see* ECF No. 16-1 at 5). Indeed, it is Defendant's alleged weaponization of the fixed prices and trainer system that has given rise to the dispute between the parties. (ECF No. 16 ¶¶ 17-20, 46, 49-52.) *See also Golden Fortune*,

17

2022 WL 3536494, at *3 ("The lynchpin of the community of interest element . . . is the vulnerability of the purported franchisee.").

Second, while Plaintiff's allegations of economic dependence are not overwhelming, they are enough at the motion to dismiss stage, especially in light of the other factors. Plaintiff alleges that over 20% of its annual gross sales were attributed to Defendant's curricula materials. (ECF No. 16 ¶ 91.) *Compare Golden Fortune*, 2022 WL 3536494, at *4 (finding no community of interest at preliminary injunction stage when, *inter alia*, licensor's products accounted for only 8.6% of licensee's annual revenue), *with Lawmen*, 330 F. Supp. 3d at 1034 (finding licensee plausibly alleged community of interest when sales made pursuant to Distribution Agreement constituted 21.5% of licensee's sales when other factors militated in favor of community of interest).

Plaintiff has also sufficiently alleged facts such that the final two factors, which are closely connected, support finding a community of interest. The third factor, disparity in bargaining power, "means that the purported franchisor has 'become[ ] dependent as a result of the relation itself'" and "occurs when the purported franchisee has been 'induce[d] or require[d] . . . to invest in skills or assets that have no continuing value to' the franchisee if the business relationship is terminated." *Golden Fortune*, 2022 WL 3536494, at *4 (quoting *Cassidy*, 944 F.2d at 1142). "The fourth and final factor refers to any significant specific investment in capital equipment by the purported franchisee that could only be used for the benefit of the purported franchisor." *Id.* (internal quotation marks omitted and alteration adopted). That investment, however, need not consist of "money or tangible assets in order to attain the status of a franchisee." *Cassidy*, 944 F.2d at 1144. Instead, "a licensee's investment could be in the years of effort required to gain

18

specialized skills or knowledge valuable to market the licensed product efficiently, but of little use beyond that." *Id.*

Here, Plaintiff alleges that during the past ten years, its trainers have been taught Defendant's curricula. (ECF No. 16 ¶¶ 17-18, 22.) The specific training and "specialized skills or knowledge" that Plaintiff invested in for over ten "years of effort" to support Defendant's business will be "of minimal utility outside the franchise," *Cassidy*, 944 F.2d at 1143, because Plaintiff would have to teach its instructors an entirely new curricula after the franchise's dissolution. Thus, it is plausible that such dynamic creates a disparity in bargaining power under which Plaintiff is pressured into acceding to Defendant's demands in order to preserve the franchise. Accordingly, taken together, Plaintiff plausibly alleges it satisfies the "community of interest" requirement.

Because Plaintiff alleges the "place of business," "license," and "community of interest" requirements, Count I survives.

### B.  Declaratory Judgment

Defendant argues that Plaintiff's Declaratory Judgment Act claim rises and falls with its NJFPA claim because it "merely seek[s] to enforce its NJFPA claim." (ECF No. 18-1 at 23.) Because Plaintiff's NJFPA claim will proceed, its Declaratory Judgement claim will proceed as well.

### C.  Remaining Claims

#### 1.  *Forum Selection Clause*

Defendant argues the remaining claims should be dismissed without prejudice because of the PSA's forum selection clause. (ECF No. 18-1 at 24-25.) The clause states that "all actions arising out of a conflict of law shall be heard in Hillsborough County, Florida." (ECF No. 16-1 at 8.) Plaintiff argues the forum selection clause is invalid and, in any event, it is unclear whether it

19

applies given that it refers to actions "arising out of a conflict of law."  (ECF No. 19 at 28-30.)

Plaintiff responds that "if Plaintiff is not a franchisee under the NJFPA statute and the NJFPA is

otherwise inapplicable to Plaintiff, then the [PSA's] . . . forum-selection clause dictates that the

remaining causes of action should be dismissed, without prejudice (or transferred to Florida)."

(ECF No. 20 at 15.)

"A forum selection clause will be invalidated . . . if the resisting party can . . . show

enforcement of the clause would contravene a strong public policy of the forum in which the suit

is brought[.]" *Intermetals Corp. v. Hanover Int'l*, 188 F. Supp. 2d 454, 458 (D.N.J. 2001), *aff'd*,

36 F. App'x 491 (3d Cir. 2002).  "[T]he effect to be given a contractual forum selection clause in

diversity cases is determined by federal not state law."  *Jumara v. State Farm Ins. Co.*, 55 F.3d

873, 877 (3d Cir. 1995).  Federal law applies because "questions of venue and the enforcement of

forum selection clauses are essentially procedural, rather than substantive, in nature."  *Id.* (internal

quotation marks and citations omitted).  "Such an analysis, however, does not ignore state policies.

Although the courts must apply federal law, 'state policies should be weighed in the balance.'"

*Cadapult Graphic Sys. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 563 n.2 (D.N.J. 2000) (quoting

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).

As to state policy, the Supreme Court of New Jersey held that "forum-selection clauses in

contracts subject to the [NJFPA] . . . are presumptively invalid because they fundamentally conflict

with the basic legislative objectives of protecting franchisees from the superior bargaining power

of franchisors and providing swift and effective judicial relief against franchisors that violate the

Act."  *Kubis & Perszyk Assoc. v Sun Microsystems*, 680 A.2d 618, 626 (N.J. 1996).  "*Kubis* only

applies where . . . a plaintiff asserts a valid claim under the [NJFPA]."  *Cadapult*, 98 F. Supp 2d at

565.  When a plaintiff has asserted such a claim, federal courts have declined to transfer venue for

20

not just the NJFPA claim but also related non-NJFPA claims.  *See Bus. Store, Inc. v. Mail Boxes Etc.*, Civ. No. 11-3662, 2012 WL 525966, at \*6-10 (D.N.J. Feb. 16, 2012) (denying motion to transfer NJFPA claim and "common law causes of action" despite forum selection clause when "the genesis of [p]laintiff's case [was] [d]efendants' alleged breaches of the [f]ranchise [a]greements which amount[ed] to various violations of the NJFPA."); *Goldwell of New Jersey, Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 171 n.1, 193-196 (D.N.J. 2009) (declining to enforce forum selection clauses in agreements subject to NJFPA when defendant did not "attempt to rebut the presumption of inapplicability" and retaining jurisdiction over breach of good faith and fair dealing and breach of contract claims).

Here, to the extent the forum selection clause is applicable to Plaintiff's common law claims, the Court will decline to enforce it.  Defendant's only argument is that because "Plaintiff is not a franchisee under the NJFPA," the forum selection clause requires dismissal or transfer. (ECF No. 20 at 15.)  But, at this stage, Plaintiff has alleged that it is subject to the NJFPA. Therefore, under *Kubis*, the "forum-selection clause[] . . . [is] presumptively invalid," 680 A.2d at 626, and it is proper for the Court to consider this state policy in informing its transfer decision, *Cadapult*, 98 F. Supp. 2d at 563 n.2.  Because Defendant does not argue why the presumption should be rebutted, the Court sees no reason why dismissal or transfer would be appropriate.  *See Goldwell*, 622 F. Supp. 2d 168 at 171 n.1.  Accordingly, the Court will not dismiss or transfer the remaining common law claims on account of the forum selection clause.  *See Bus. Store*, 2012 WL 525966, at \*6-10; *Goldwell*, 622 F. Supp. 2d at 171 n.1, 193-196.

### 2.    *Choice of Law*

The choice of law provision in the PSA states "[t]he terms and conditions of [the PSA] and all aspects of [Plaintiff's] relationship with [Defendant] shall be construed and enforced according to the laws of the State of Florida[.]"  (ECF No. 16-1 at 8.)  Defendant analyzes the remaining

21

claims under Florida law.  (*See* ECF No. 18-1 at 24-32.)  Plaintiff analyzes each of these claims under both Florida and New Jersey law but does not contend the outcome changes depending on which law is applied.  (*See* ECF No. 19 at 30-40.)[11]  For the reasons described below, the Court will apply Florida law to the remaining claims.

"A federal district court applies the forum state's choice of law rules to diversity actions." *Ciecka v. Rosen*, 908 F. Supp. 2d 545, 552 (D.N.J. 2012) (citation omitted).  "New Jersey choice-of-law rules provide that '[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'"  *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183-84 (3d Cir. 2017) (quoting *Instructional Sys.*, 614 A.2d 124 at 133).  While New Jersey law applies to the NJFPA claim "regardless of the . . . choice of law provision," courts "must apply [the] law [provided in the choice of law provision] to the state common law claims."  *Lawmen*, 330 F. Supp. 3d at 1029 (collecting cases); *see also Ocean City Express Co. v. Atlas Van Lines, Inc.*, Civ. No. 13-1467, 2013 WL 3873235, at *4 n.4 (D.N.J. July 25, 2013) ("It may seem incongruous to apply New Jersey law and Indiana law in the same action, with New Jersey law governing the NJFPA claim and Indiana law governing the good faith and fair dealing claim. But other courts in this district have applied two states' laws to cases involving NJFPA claims."); *Goldwell*, 622 F. Supp. 2d at 193-94 (D.N.J. 2009) ("[T]he Court will respect

---

[11]    The fact that Plaintiff does not argue that the resolution of the choice of law question is dispositive to the outcomes of the common law claims indicates that the forum selection clause, even if it were enforceable, would not apply to the instant dispute because there is no true conflict. (*Compare* ECF No. 16-1 at 8 (PSA providing that "all actions arising out of a *conflict of law* shall be heard in Hillsborough County, Florida." (emphasis added)), *with Aquino v. Subaru of Am., Inc.,* Civ. No. 22-990, 2024 WL 124627, at *6 (D.N.J. Jan. 11, 2024) ("If the application of either state's law results in the same outcome, no conflict exists." (internal quotation marks and citation omitted)), *and Pycsa Pan., S.A. v. Tensar Earth Techs., Inc.*, Civ. No. 06-20624, 2006 WL 8432715, at *3 (S.D. Fl. Dec. 20, 2006) ("Because the outcome of [the defendant's] motion to dismiss will be the same regardless of which law is applied, no true conflict exists.").)

the . . . choice of law provisions stipulating that Maryland law shall govern [the] non-NJFPA claims.").

Here, the broad choice of law provision requires "all aspects of [Plaintiff's] relationship with [Defendant] [to be] construed and enforced according to the laws of the State of Florida[.]" (ECF No. 16-1 at 8.) Thus, even though this Court analyzed the NJFPA claim pursuant to New Jersey law, the Court will analyze the common law claims pursuant to Florida law. *Lawmen*, 330 F. Supp. 3d at 1029; *Ocean City*, 2013 WL 3873235, at *4 n.4; *Goldwell*, 622 F. Supp. 2d at 193-94.

### 3.    *Breach of Logistics Agreement*

Defendant seeks dismissal of the breach of the Logistics Agreement claim but does not—apart from on forum selection clause grounds that this Court rejected—seek dismissal of the breach of PSA claim. Defendant argues the Logistics Agreement is invalid because (1) the PSA contains a clause barring oral modifications, (2) the requirements to override such a clause are not pled, and (3) the statute of frauds prohibits such an oral agreement. (ECF No. 18-1 at 25-28.) Plaintiff responds that the Logistics Agreement is a separate, not modified, agreement and that, even if construed as a modification, oral modifications are permitted under Florida law and not barred by the statute of frauds. (ECF No. 19 at 30-35.) Regardless of whether the Court construes the Logistics Agreement as a modification or a new contract, Plaintiff's claim must be dismissed because Plaintiff does not plead consideration or breach.

Under Florida Law, a plaintiff must plead three elements to "enforce an alleged oral modification of a written contract which expressly requires that any modification be in writing." *Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So. 3d 989, 995 (Fla. Dist. Ct. App. 2014). These three elements are: "(a) that the parties agreed upon and accepted the oral modification (i.e., mutual assent); and (b) that both parties (or at least the party seeking to enforce the amendment)

23

performed consistent with the terms of the alleged oral modification (not merely consistent with their obligations under the original contract); and (c) that due to plaintiff's performance under the contract as amended the defendant received and accepted a benefit that it otherwise was not entitled to under the original contract (i.e., independent consideration)." *Id.* (emphasis omitted.)  And, even if construed as a separate oral contract rather than a modification of the PSA, "[f]or there to be an enforceable oral contract, there must be an offer, an acceptance, consideration, and sufficient specification of essential terms so that the obligations involved can be ascertained." *New Dirt, Inc. v. Harrison*, 182 So. 3d 773, 774 (Fla. Dist. Ct. App. 2015).  In either scenario, consideration is a required element.

Here, Plaintiff does not plead consideration.  Under the Logistics Agreement, Plaintiff alleges that it was able to reduce costs when Defendant shipped its products directly to Plaintiff's customers.  (ECF No. 16 ¶ 117.)  Defendant, however, only allegedly received two types of benefits: (1) "prompt shipments of its . . . materials directly to law enforcement agencies, thereby expanding the reach of its charitable mission" and . . . (2) information as to where its [curricula materials] were being used."  (*Id.*)  These allegations carry several deficiencies.  First, under the PSA, Defendant already had access to information about Plaintiff's customers.  (*See* ECF No. 16-1 at 3 ("[Plaintiff] shall provide to [Defendant] a quarterly report identifying each of the organizations or persons, including names, address, phone and email contact information, receiving [curricula] [r]elated [m]aterials[.]").)  *See also Okeechobee Resorts*, 145 So. 3d at 995 (holding that for consideration to be adequate in an oral modification the defendant must receive "a benefit that it otherwise was not entitled to under the original contract"); *Slattery v. Wells Fargo Armored Serv. Corp.*, 366 So.2d 157, 159 (Fla. Dist. Ct. App. 1979) ("The performance of a pre-existing duty does not amount to the consideration necessary to support a contract.").  Second,

Plaintiff alleges that consideration was satisfied by providing Defendant access to customer contract information, yet Plaintiff simultaneously alleges that Defendant's use of that information violated the Logistics Agreement.  (ECF No. 16 ¶ 117-119.)  But if leveraging such access was a breach, as Plaintiff alleges, then Plaintiff fails to plead what benefit it conferred on Defendant by giving it that access.  Or, alternatively, it is not plausible that Defendant "bargained for" such an illusory benefit.  *See* Restatement (Second) of Contracts § 71 (A.L.I. 1981).

The only remaining alleged benefit is the "prompt shipments" that "expand[ed] the reach of [Defendant's] charitable mission."  (ECF No. 16 ¶ 117.)  But consideration is only satisfied "by any act of the plaintiff from which the defendant derives a benefit, or . . . by any labor, detriment, or inconvenience, however small, sustained by the plaintiff, if such act as performed or inconvenience suffered is by the consent express or implied of plaintiff."  *Mangus v. Present*, 135 So. 2d 417, 419 (Fla. 1961) (internal quotation marks omitted).  Here, Plaintiff does not allege that it performed an act that conferred a benefit on Defendant.  Instead, Plaintiff alleges that Defendant's own "prompt shipment[]" constitutes the benefit.  (ECF No. 16 ¶ 117.)  But to the extent that is a benefit, it an act performed by Defendant.  And Plaintiff does not allege it sustained any new "labor, detriment, or inconvenience" through the Logistics Agreement.  *Mangus*, 135 So. 2d at 419.  Indeed, it is through the Logistics Agreement that Plaintiff is absolved of prior responsibilities because it is no longer required to ship or pay for certain materials.  Accordingly, without consideration, Plaintiff has not alleged the existence of a valid contract.

Plaintiff's claim must also be dismissed because Plaintiff does not allege a breach of the Logistics Agreement, even if it were a valid contract.  Under the Logistics Agreement, the parties agreed for Defendant to "ship [the curricula materials] directly to certain of [Plaintiff's] customers[.]"  (ECF No. 16 ¶ 28.)  As pled, therefore, the only requirement under the Logistics

25

Agreement was to ship the materials.  Plaintiff alleges Defendants breached the Agreement by "surreptitiously soliciting LEAD's customers," (*id.* ¶ 119), but nowhere does Plaintiff allege that this activity was prohibited by the terms of the oral agreement.  Plaintiff alleges that there was an "understanding and expectation by [Plaintiff] that the information it provided to the [Defendant] was confidential . . . [and] would be used solely to ship the materials to [Plaintiff]'s customers." (*Id.* ¶ 29.)  However, one party's expectation does not provide the mutual assent needed to form an enforceable contract.  *See Sec. of Labor v. Am. Bronze Foundry, Inc.*, Civ. No. 12-1100, 2013 WL 5720146, at *2 (M.D. Fla. Oct. 21, 2013) ("Florida law requires mutual assent to form a contract [and] [a]ll parties must manifest their assent to every essential term." (internal quotation marks and citations omitted)).  And because that expectation, as pled, was not part of the Logistics Agreement, Plaintiff's asserted breach is not in fact a breach of the Logistics Agreement.[12]

Accordingly, because Plaintiff fails to plead consideration and breach, the Court will dismiss Count IV.

### 4. *Covenant of Good Faith and Fair Dealing*

In Count V, Plaintiff brings a claim for breach of the covenant of good faith and fair dealing. (*See* ECF No. 16 ¶¶ 121-128.)  "While every contract contains an implied covenant of good faith and fair dealing under Florida law, a breach of this covenant—standing alone—does not create an independent cause of action."  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012) (internal quotation marks omitted).  Rather, it must "relate to the performance of an express term

---

[12]    Plaintiff also alleges that Defendant promised to "not solicit[] law enforcement agencies with whom [Plaintiff] did business."  (ECF No. 116 ¶ 144.)  But Plaintiff alleges this promise was made "throughout the parties' relationship and subsequent to the execution of the [PSA.]"  (*Id.*) Accordingly, while this allegation may be relevant to a promissory estoppel claim—and indeed is pled under that portion of the FAC—Plaintiff has not alleged it was a promise made under the Logistics Agreement.

of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1235 (Fla. Dist. Ct. App. 2001) (emphasis and internal quotation marks omitted); *see also Townhouses of Highland Beach Condo. Ass'n v. QBE Ins. Corp.*, 504 F. Supp. 2d 1307, 1310 (S.D. Fla. 2007) ("A claim for breach of the implied covenant of good faith and fair dealing cannot be maintained in the absence of a breach of an express term of the contract." (citing *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005))). "A claimant asserting a cause of action for breach of the implied covenant must allege a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Resnick*, 693 F.3d at 1329.

However, even when a party pleads these elements, "a claim for breach of an implied covenant of good faith and fair dealing is invalid when it is based on the same facts as the breach of contract." *BCN Catering Bars SL v. Ozuna*, Civ. No. 25-21553, 2025 WL 2590358, at *7 (S.D. Fla. Sep. 8, 2025) (collecting cases); *see also Griffin v. Motorsport Games, Inc.*, Civ. No. 24-21929, 2024 WL 4564330, at *6 (S.D. Fla. Oct. 24, 2024) ("[Plaintiff's] breach of an implied covenant of good faith and fair dealing [claim] is invalid because [plaintiff] makes the same allegations supporting his breach of contract claim."); *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1319 (M.D. Fla. 2000) ("[A] breach of the implied duty may be dismissed as redundant where the conduct allegedly violating the implied covenant is duplicative of the companion cause of action alleging breach of contract."); *Regency of Palm Beach, Inc. v. QBE Ins. Corp.*, Civ. No. 08-81442, 2009 WL 2729954, at *5 (S.D. Fla. Aug. 25, 2009) ("A breach of the implied covenant of good

27

faith and fair dealing cannot be advanced when the allegations underlying that claim are duplicative of the allegations supporting the breach of contract claim[.]").

Here, Plaintiff's good faith and fair dealing claims are in connection with both the PSA and Logistics Agreement.  (*See* ECF No. 16 ¶¶ 121-128.)  To the extent the claims are premised on the Logistics Agreement, they must be dismissed because Plaintiff has not alleged a breach of the Logistics Agreement.  *See supra* III.C.3; *Resnick*, 693 F.3d at 1329; *Townhouses of Highland Beach,* 504 F. Supp. 2d 1307 at 1310.

Plaintiff's claim must also be dismissed in connection with the PSA because it is duplicative of its breach of contract claim.  Plaintiff alleges Defendant violated the covenant of good faith and fair dealing by "surreptitiously soliciting [Plaintiff]'s customers."  (ECF No. 16 ¶ 124 (listing the ways in which Defendant solicited Plaintiff's customers).)  But Plaintiff similarly alleges that Defendant "materially breached the [PSA] by . . . surreptitiously soliciting and selling to [Plaintiff's] clients."  (*Id.* ¶ 108.)  Plaintiff also asserts that Defendant violated the covenant by "imposing performance requirements on [Plaintiff] and on its trainers that are not specified in the [PSA], and by limiting [Plaintiff's] Master Trainers to five."  (*Id.* ¶ 124.)  Yet, Plaintiff likewise alleges that Defendant "materially breached the [PSA]" by "imposing unreasonable requirements on [Plaintiff] that were not set forth in the [PSA]" and "changing training guidelines to create difficulties for [Plaintiff]."  (*Id.* ¶ 108.)  Thus, even if Plaintiff has asserted the requisite elements for a breach of an implied covenant claim, *see Resnick*, 693 F.3d at 1329, the claim must be dismissed because Plaintiff's allegations are "based on the same facts as the breach of contract" claim, *Ozuna*, 2025 WL 2590358, at *7; *see also Griffin*, 2024 WL 4564330, at *6; *Shibata*, 133 F. Supp. 2d at 1319; *Regency of Palm Beach*, 2009 WL 2729954, at *5.  Accordingly, the Court dismisses Count V.

### 5.      *Tortious Interference with Contractual Relations*

In Count VI of the FAC, Plaintiff brings a claim for tortious interference with contractual relations.  (*See* ECF No. 16 ¶¶ 129-142.)  Plaintiff's theory is that Defendant tortiously interfered in two ways: (1) hiring Yocca despite non-compete and confidentiality provisions in Yocca's employment contract with Plaintiff and (2) exploiting the Logistics Agreement to solicit Plaintiff's customers.   (*See id.*)   Despite Plaintiff's clear intent to assert a tortious interference with contractual relations claim in the FAC, the parties brief the issue of tortious interference with *business relations*.  (*See* ECF No. 18-1 at 29-30 (Defendant listing "the elements for tortious interference with a business relationship" (citing *Sobi v. Fairfield Resorts, Inc.*, 846 So. 2d 1204, 1207 (Fla. Dist. Ct. App. 2003)); ECF No. 19 at 36 (Plaintiff citing *Sobi*, 846 So. 2d at 1207 (listing the elements for tortious interference with a business relationship but not tortious interference with contract))).  But, "a party cannot amend a pleading through briefing on a motion[.]"  *Brown v. State*, Civ. No. 24-1900, 2025 WL 2808619, *1 n.1 (M.D. Fla. June 6, 2025) (citing *Gilmour v. Gates*, *McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("[T]he proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).")).  Accordingly, while the elements for both are similar, the Court will only analyze the tortious interference with contractual relations claim.

"Under Florida law, the elements of the 'tortious interference with a contractual relationship' tort are: '(1) The existence of a contract, (2) The defendant's knowledge of the contract, (3) The defendant's intentional procurement of the contract's breach, (4) Absence of any justification or privilege, [and] (5) Damages resulting from the breach.'"  *Clearplay, Inc. v. Nissim Corp.*, 555 F. Supp. 2d 1318, 1325 (S.D. Fla. 2008) (quoting *McKinney–Green, Inc. v. Davis*, 606 So. 2d 393, 397-98 (Fla. Dist. Ct. App. 1992)).

The Court begins with Plaintiff's first theory of recovery. Plaintiff readily pleads elements one, two, three, and five. First, Plaintiff alleges it had a contract with its former employee Yocca. (ECF No. 16 ¶ 130.) Second, Defendant knew about Yocca's employment contract, and the non-compete and confidentiality provisions contained therein, because Defendant reviewed it before Defendant hired Yocca. (*Id.* ¶ 138.) Third, Defendant intentionally procured a breach of that employment contact by hiring Yocca despite knowledge of provisions in her contract that precluded her "from working for [Plaintiff's] competitors like [Defendant] and/or disclosing confidential information" to Defendant. (*Id.* ¶ 139; *see also id.* ¶ 39.) Finally, Plaintiff pleads damages. (*Id.* ¶ 141.)

The fourth element requires more analysis. This element focuses on "whether the [defendant's] conduct was improper or unjustified within the confines of the tort of interference." *Seminole Tribe of Fla. v. Times Pub. Co.*, 780 So. 2d 310, 315 (Fla. Dist. Ct. App. 2001); *see also SIG Sauer, Inc. v. D&M Holding Co.*, Civ. No. 21-0194, 2022 WL 445747, at *6 (M.D. Fla. Feb. 14, 2022) ("A defendant's conduct can lack justification if its means are improper." (citing *Hurchalla v. Lake Point Phase I, LLC*, 278 So. 3d 58, 67 (Fla. Dist. Ct. App. 2019))). "In determining whether interference was proper, a factfinder can look to seven factors, including the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff, the 'social interests in protecting the freedom of action of the [defendant] and the contractual interests of the other,' the 'proximity . . . of the [defendant's] conduct to the interference,' and the 'relations between the parties.'" *SIG Sauer*, 2022 WL 445747, at *6 (quoting *Seminole Tribe*, 780 So. 2d at 315). "Where there is room for 'different views' about whether a defendant's interference was proper, 'the determination of whether the interference was improper or not is ordinarily left to the jury.'" *Id.* (quoting *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1280 (11th Cir.

30

2015)).  "But where a plaintiff fails 'to adequately allege improper methods,' a court must dismiss the complaint."  *Id.* (denying motion to dismiss) (quoting *Duty Free*, 797 F.3d at 1280-81).

Here, Plaintiff plausibly alleges that Defendant lacked justification for its actions.  Plaintiff alleges that Defendant hired Yocca to exploit her knowledge of Plaintiff's confidential and proprietary information.  (ECF No. 16 ¶ 140.)  In particular, before Yocca resigned from Plaintiff, she was in the process of developing a national after-school initiative, which involved law enforcement officers providing drug abuse and antiviolence education to children in after-school programs.  (*Id.* ¶¶ 39, 55.)  Plaintiff alleges that Defendant leveraged Yocca's confidential knowledge to develop these after-school programs, but Defendant refused to sell them to Plaintiff in violation of the PSA.  (*Id.* ¶ 56.)  Plaintiff alleges this refusal was part of Defendant's plan to "usurp" and "destroy" Plaintiff's business.  (*Id.*)  Many of the factors discussed in *SIG Sauer* and *Seminole Tribe* are relevant here.  For example, the allegations suggest Defendant had a nefarious motive and Defendant was proximately involved in procuring the breach.  *See SIG Sauer*, 2022 WL 445747, at *6; *Seminole Tribe*, 780 So. 2d at 315.  And the parties here are closely intertwined, such that a factfinder could conclude that Defendant's conduct was "not sanctioned by the rules of the game."  *SIG Sauer*, 2022 WL 445747, at *6 (internal quotation marks and citation omitted).  Accordingly, "[Plaintiff] plausibly alleges that [d]efendant[] lacked justification in the means it employed in recruiting" Yocca.  *Id.* at *7.  At this stage, dismissal is not warranted under this theory of tortious interference with contract.

The Court next considers Plaintiff's second theory of recovery concerning Plaintiff's customers.  Plaintiff readily alleges elements one, two, four, and five.  First, Plaintiff alleges it had contracts with its customers.  (ECF No. 16 ¶ 130.)  Second, Plaintiff alleges Defendant was aware of those contracts given that Defendant shipped materials to them.  (*Id.* ¶ 131.)  As for the fourth

element, Plaintiff alleges that Defendant's actions in soliciting Plaintiff's customers through those shipments were in violation of the PSA and motivated by an intention to unfairly compete with and harm Plaintiff. (*Id.* ¶¶ 41-46, 132-137.) Finally, Plaintiff alleges it suffered damages. (*Id.* ¶¶ 43, 141.)

The third element, however, is not sufficiently alleged. Under this element, "a breach of the contract is a necessary element[.]" *Sourcing Sols. USA, Inc. v. Kronos Am., LLC*, Civ. No. 10-23476, 2011 WL 13223514, at *3 (S.D. Fla. Jan. 26, 2011) (dismissing claim with leave to replead when plaintiff did not allege "a breach or nonperformance of the contract"). Here, Plaintiff alleges that as a result of Defendant's solicitations, Plaintiff's customers "are filing repurchase orders through [Defendant]" instead of through Plaintiff, and these customers "believe that such direct purchases are authorized by [Plaintiff]." (*Id.* ¶¶ 43-44.) However, even accepting these allegations as true, as the Court must, there is no indication that by purchasing from Defendant, the customers are breaching their contracts with Plaintiff. Indeed, there are no allegations that, for example, the customers were contractually required to repurchase materials from Plaintiff or not purchase materials from Defendant. Accordingly, the Court will dismiss this claim with respect to the customers, with leave to replead. *Sourcing Sols.*, 2011 WL 13223514, at *3.

### 6.    *Promissory Estoppel*

"Promissory estoppel is 'the principle that a promise without consideration may nonetheless be enforced to prevent injustice'; the doctrine thus traditionally applies 'as an exception to the requirement of consideration in the formation of a contract.'" *Vanguard Plastic Surgery, PLLC v. UnitedHealthcare. Ins. Co.*, 658 F. Supp. 3d 1250, 1262 (S.D. Fla. 2023) (quoting *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 93 (Fla. 2013)). "By its very nature, promissory estoppel does not turn on mutual assent to be bound in the same way as a contract claim. Rather, the essence of promissory estoppel is detrimental reliance." *Fin.*

32

*Healthcare Assocs., Inc. v. Pub. Health Tr. of Miami-Dade Cnty.*, 488 F. Supp. 2d 1231, 1237 (S.D. Fla. 2007) (citations omitted).  Under Florida law, the elements of promissory estoppel are: "(1) a representation as to a material fact that is contrary to a later-asserted position; (2) a reasonable reliance on that representation; and (3) a change in position detrimental to the party claiming estoppel caused by the representation and reliance thereon." *FCCI Ins. Co. v. Cayce's Excavation, Inc.*, 901 So. 2d 248, 251 (Fla. Dist. Ct. App. 2005).  "The promise must be definite and the reliance upon it reasonable." *Chiron Recovery Center, LLC v. United Healthcare Servs. Inc.*, Civ. No. 18-81761, 2020 WL 3547047, at *8 (S.D. Fla. June 30, 2020) (internal quotation marks and citation omitted).

Here, Plaintiff pleads each of the promissory estoppel elements.  First, Plaintiff asserts Defendant broke a promise to "not solicit[] law enforcement agencies with whom [Plaintiff] did business." (ECF No. ¶ 144; *see also id.* ¶147.)[13]  Second, Plaintiff alleges it relied on that promise by continuing to provide Defendant with confidential contact information, and it is plausible that the reliance was reasonable given that, prior to the promise, the parties had a harmonious relationship and continually renewed the PSA.  (*Id.* ¶¶ 22, 27, 146.)  In other words, because the parties had a successful working relationship, it is plausible that relying on Defendant to keep its promise was reasonable.  Finally, as a result of that reliance, Plaintiff found itself in a "detrimental" position because Defendant usurped its customers in defiance of that promise.  (*Id.* ¶¶ 41-43, 147.)  Indeed, the parties do not dispute whether these elements are satisfied.  (ECF No. 18-1 at 31-32; ECF No. 19 at 38-40.)

---

[13]    "An oral promise may form the basis of a promissory estoppel claim." *Winnie v. Infectious Disease Assocs., P.A.*, Civ. No. 15-2727, 2016 WL 11670293, at *6 (M.D. Fla. Sep. 21, 2016) (citing *W.R. Grace & Co. v. Geodata Serv., Inc.*, 547 So. 2d 919, 920 (Fla. 1989)).

Instead, the remaining issue is whether this claim may proceed even if the PSA breach of contract claim also proceeds. "While the law does not permit a party to simultaneously prevail on a promissory estoppel theory and a contractual theory, it does not require the dismissal (at the motion to dismiss stage) of a promissory estoppel claim merely because an express contract exists that arguably governs the conduct complained of. That argument may be properly raised at a later stage in this litigation, such as summary judgment." *Maurice's Jewelers II, Inc. v. Pandora Jewelry, LLC*, Civ. No. 16-25079, 2017 WL 3822056, at *4 (S.D. Fla. Aug. 30, 2017) (internal quotation marks and citation omitted) (alterations adopted). Indeed, the cases Defendant cites in support of dismissal were each decided at the summary judgment stage. (*See* ECF No. 18-1 at 32 (first citing *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x. 450, 454 (11th Cir. 2006) (affirming denial of promissory estoppel claim at summary judgment); and then citing *W. Wyvern Cap. Invs. LLC v. Bank of Am., N.A.*, Civ. No. 22-191, 2024 WL 3090674, at *11 (M.D. Fla. June 20, 2024) (same), *aff'd*, 2025 WL 1012852 (11th Cir. Apr. 1, 2025)).) Thus, the Court finds dismissal of this claim premature.

## IV.    CONCLUSION

For the foregoing reasons, and other good cause shown, Defendant's Motion to Dismiss (ECF No. 18) is **GRANTED in part** and **DENIED in part**. An appropriate Order follows.

Dated: May 5, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

34